# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

IN RE BOLIN & COMPANY, LLC

ROLAND CHORCHES, Trustee of the
Estate of Bolin & Company, LLC,
      Plaintiff,

      v.

SALLY OGDEN,
      Defendant.

CIVIL ACTION NO.
3:08cv1793 (SRU)

## MEMORANDUM OF DECISION

This case arises from the bankruptcy of Bolin & Company, LLC ("Bolin"), a jewelry

retailer in Greenwich, Connecticut. It concerns actions the defendant, Sally Ogden, took during

the week of July 30, 2004 that the plaintiff claims to have precipitated Bolin's bankruptcy. The

United States Bankruptcy Court for the District of Connecticut previously had jurisdiction over

this case pursuant to 28 U.S.C. § 157(b), which permits bankruptcy courts to exercise jurisdiction

over "all core proceedings" under the Bankruptcy Code, including matters affecting the

liquidation of the assets of the bankrupt estate. This court has jurisdiction under 28 U.S.C. §

1334(b), which grants district courts original jurisdiction over civil actions arising in or related to

bankruptcy proceedings.

On April 30, 2007, the plaintiff, the Chapter 7 bankruptcy trustee for Bolin's estate[1]

commenced this lawsuit in the United States Bankruptcy Court for the District of Connecticut as

an adversary proceeding against Ogden and Shannon Howey, a former Bolin employee. On

---

[1] Michael J. Daly served as bankruptcy trustee when this lawsuit began; Daly resigned as
trustee on July 27, 2009, and Roland Chorches was appointed on July 28, 2009.

November 24, 2008, I withdrew reference to the bankruptcy court of the plaintiff's claims against

Howey, and on December 19, 2008, I consolidated the proceedings against Howey and Ogden in

this court. Howey was then dismissed as a defendant on August 6, 2009. A bench trial began on

September 29, 2009 and ended on October 8, 2009.[2]

My findings of fact and conclusions of law are set forth below. I proceed in two parts.

First, I discuss the facts and law relevant to Ogden's liability. I then turn to the damages that

Ogden owes.

**I.      Ogden's Liability**

A.      <u>Findings of fact</u>

The relevant history of Bolin from its inception until the week of its closing can be

divided into three parts. First, there are the facts of Bolin's history before the week of July 26,

2004; second, there are the facts leading to the closing of Bolin on July 30, 2004; and, finally, the

aftermath of Bolin's demise.

1.      *Bolin's history before July 26, 2004*

a.      Bolin's origins

Andrea Ulanoff and her partner, Noah Citrin, opened Bolin in 2000 as a retail shop for

antique, custom, and unusual or niche pieces of jewelry. Ulanoff, a former advertising and

marketing professional, was to be responsible for the business and management sides of the

store, and Citrin, a jeweler by trade, was to be responsible for the design and repair of the store's

jewelry. In August 2000, Andrea Ulanoff registered Bolin as a Connecticut limited liability

---

[2] At the end of the Trustee's case, Ogden moved for judgment on partial findings. (Doc.
# 49). I took that motion under advisement. I now deny that motion and, instead, decide the case
based on my findings of fact and conclusions of law in this memorandum of decision.

company in which she was the only principal. Citrin was not designated a principal because he had recently closed his own jewelry store and declared bankruptcy; in addition, Ulanoff's mother, Sylvia Ulanoff, loaned start-up money to help Bolin on the condition that Citrin not be a principal in the venture. Ulanoff and Citrin both signed Bolin's lease on Bolin's behalf, however; the landlord was never notified that Citrin was not a principal in the LLC.[3]

Bolin borrowed $500,000 from several sources to finance its start-up costs. Bolin borrowed $100,000 from Ulanoff and another $400,000 from her mother, Sylvia Ulanoff. Sylvia Ulanoff lent the $400,000 in two installments: in November 2000, she lent Bolin $150,000, and in January 2001, she lent another $250,000. Sylvia Ulanoff and Bolin entered promissory notes and security agreements for both of those loans, but the security agreement for the first loan of $150,000 was never properly filed as a UCC-1 agreement with the Connecticut Secretary of State. That fact was discovered only after Bolin declared bankruptcy.

Bolin opened its store in December 2000 at 356 Greenwich Avenue, where it would

---

[3] Tikva Citrin, Noah Citrin's mother, was also involved in Bolin. In Bolin's original operating agreement, Tikva Citrin is identified as Bolin's managing member and majority owner. In two different amendments to Bolin's operating agreement, Tikva Citrin is listed as owning, respectively, 70 percent (Ex. 142) and 85 percent (Ex. 139) of the company. According to Ulanoff, the second ownership percentage was the accurate figure, and the 70 percent ownership statement was a mistake. Tikva Citrin was designated as owning 85 percent of the company in order for Bolin to obtain a loan from Wells Fargo bank in 2002. (Ex. 141.) (Ulanoff was deemed too great a credit risk to secure the loan without Tikva Citrin's majority stake.)

Despite Tikva Citrin's designation as the managing member, her participation in the company was purely nominal. She did not make decisions for the store or exercise discretion concerning Bolin's operations; her single function was to make Bolin more creditworthy. As further proof of Tikva Citrin's detachment from Bolin's affairs, Ulanoff agreed to indemnify and hold her harmless for any causes of action arising from Bolin's business. (Ex. 136.) According to Ulanoff, that indemnification agreement was a predicate for Tikva Citrin's agreement to serve as the store's managing member. In December 2002, Tikva Citrin resigned as managing member, although the indemnification agreement remained effective. (Ex. 138.)

continue to operate until closing on July 30, 2004.  Business hours were Tuesday through Saturday, from 9 to 5, a schedule that Bolin maintained until it shuttered.  Bolin sold jewelry that it owned and that it held on consignment.  Under a consignment agreement, Bolin sold jewelry on loan from a vendor and would collect a fee from the vendor on each completed sale; if Bolin was unable to sell a consigned piece, the store would return it to the vendor.  Bolin usually held more consigned jewelry than owned jewelry in its inventory; several witnesses testified that, at the time of the store's closing, one-third of Bolin's inventory consisted of owned items, while the remaining two-thirds were consigned pieces.  Bolin also repaired jewelry for customers and would sometimes sell customers' jewelry on consignment.  Ulanoff and Citrin were Bolin's only employees in the store's early days.  They worked in the store during business hours and conducted themselves as the store's managers, together buying insurance and installing a security system.  Ulanoff received between $100,000 and $150,000, and Citrin received approximately $60,000, in annual compensation.

Business was slow at the outset – by opening in December 2000, Bolin was too late to capitalize on the holiday shopping season, which had started weeks earlier – and the store reported a loss for the 2000 fiscal year.  (Ex. 92.)  But Bolin proceeded to grow in 2001.  Between 2000 and 2001, Bolin held on average 150 pieces of jewelry worth, in sum, $500,000 at cost; the average price for an item was $2,500.  By the end of 2001, Ulanoff claims, the store held $1 million in inventory.  That year, as the store grew, Bolin hired three part-time employees: Kathleen Raby, Joan Goss, and Elaine Tracy.  Raby was paid between $18 and $20 an hour, and Goss received less than $20,000 a year.  Tracy's salary was never stated at trial but, according to Ulanoff, it was not significant.

From 2001 to 2002, Bolin's sales traced the arc of the national economy: business ground to a near halt following September 11, 2001 – the store reported a net loss for 2001 (Ex. 91) – and rebounded as the market recovered. Despite increasing sales in 2002, however, Bolin faced significant management problems. Ulanoff had trouble establishing relationships with jewelry vendors and adjusting to the business practices of the jewelry industry. Ulanoff also struggled to keep adequate records of the items she was receiving in inventory and the sales that Bolin was making. Although Bolin had an electronic inventory system for its jewelry, Ulanoff failed to update it consistently.

Finally, Bolin had significant cash-flow difficulties. Ulanoff often bought jewelry with a series of post-dated checks, each reflecting partial payment, for vendors to deposit over time once each check's date had passed. In effect, Ulanoff was buying jewelry on credit, and would pay vendors in installments after receiving their jewelry. Ulanoff's post-dated checks bounced frequently, however. Indeed, Bolin's habit of bouncing checks continued until it went out of business in 2004; Bolin bounced 660 checks, including paychecks to its employees, between April 2003 and July 2004, amassing more than $12,000 in overdraft fees. (Ex. 309.) Bolin also had problems paying vendors for jewelry it sold on consignment. The store had a reputation for being very slow to repay vendors for the consigned pieces it sold. It took Bolin an average of 122 days to pay its accounts payable. (Ex. 1031.) That was well above the time it took other comparable retail shops to make similar payments.

Several parties won judgments for unpaid debts against Bolin between 2002 and 2004. The New York Times Company won a judgment of $6,400 against Bolin on October 18, 2002 (Ex. 134); Walter Bernd won a judgment of $3,535 against the store on October 21, 2003 (Ex.

133); Albert Tsang Jewelry Design Ltd. won a judgment of $18,112.39 against the store on June 28, 2004 (Ex. 317); and Wartski, Ltd. won a judgment of $13,092.44 on August 16, 2004 (Ex. 132). Besides those judgments, it was common for vendors to call Bolin to complain about not being paid. Joan Goss, another Bolin part-time worker, testified that she quit her job in February 2004 because she felt constantly harassed by phone calls from unhappy and unpaid vendors.

### b. Sally Ogden's involvement in Bolin

Because of those problems, Ulanoff became interested in finding another principal for Bolin. That potential partner was Sally Ogden, the defendant in this case. Ogden, a Greenwich homemaker, had been a frequent customer at Bolin beginning in 2001. Ulanoff knew her from her visits to the store and from conversations they had while Ogden was shopping; the two developed a friendship based on their interactions in the store. Ulanoff believed that Ogden would be a strong addition to Bolin because she had worked previously in a retail couture business. She also thought that Ogden, who had contacts with other potential jewelry consumers, could attract more customers to the store. Ulanoff was prepared to offer Ogden a 50 percent stake in the store and shared management responsibilities.

Ogden loaned $270,000 to Bolin in July 2002. That loan was to help Bolin with its business; Ogden did not intend it as an equity investment in Bolin. Several months later, in November 2002, Ogden submitted an application for "key man" insurance in which Bolin was the beneficiary. (Ex. 457.) This required her to meet with Bolin's insurance agent, have blood tests performed, and give information about her health and medical history. The application was accepted, and Bolin was responsible for paying the premium. The key man insurance is the only evidence that conclusively points toward some intent by Ogden to become a principal in Bolin.

Evidence of Ogden's subsequent activity, however, shows that, although Ulanoff wanted her to become an owner and manager of the business, Ogden never assumed those roles.

In late 2002, Ogden's $270,000 loan to Bolin was memorialized in a promissory note and secured by a security agreement.[4] The terms of the promissory note and security agreement differ in several ways. Most significantly for the purposes of this case are their terms concerning default and Ogden's rights to repayment. The promissory note permits Ogden to make a demand for repayment for the full sum whenever she wants. (Ex. 416.) The note grants Bolin five days to repay; it is only after the five-day period has expired that Bolin defaults. (*Id.*) The promissory note includes no prescription about how Ogden, as creditor, is to recover collateral in the event of Bolin's default. The security agreement, on the other hand, affords Ogden much greater rights with respect to demanding payment and remedying a default. First, the security agreement's definition of default is more inclusive than the promissory note. Under the promissory note's terms, default only occurs when Bolin, the debtor, fails to meet Ogden's demand for payment. But section 8 of the security agreement defines a default as occurring because of, *inter alia*, any of the following conditions:

> [F]ailure of any Obligor . . . to pay when due (whether by acceleration or otherwise), any amount payable on any of the obligations, . . . loss, theft, substantial damage, destruction, sale, or encumbrance to or of any of the

---

[4] There was some confusion in the drafting of the promissory note. Two promissory notes were signed. The first entitled Ogden to a sum of $500,000, which was more than Ogden had actually loaned the store; that note was dated November 20, 2002, the same date as the security agreement. The second promissory note, entered on December 6, 2002, entitled Ogden to a sum of $270,000, the correct amount of her loan. No other term in the December 6 promissory note was changed. Because the December 6 promissory note includes the correct value of Ogden's loan, I am treating it as the effective note entitling Ogden to repayment. The November 20, 2002 security agreement was also for the correct amount, and was filed with the Connecticut Secretary of State as a UCC-1 agreement on December 12, 2002.

> Collateral, or the making of any levy, seizure, or attachment thereof or
> thereon . . . the entry of a judgment against any Obligor . . . [or] the
> dissolution, incompetence, consolidation, or reorganization of any obligor.

(Ex. 3 ¶ 8.)

Section 9 of the security agreement then explains what Ogden, as the secured creditor, is entitled to do "[u]pon the occurrence of any such default" and, even in absence of an actual default by Bolin, "whenever Secured Party feels insecure for any reason whatsoever." (*Id.*) In either of these events, the security agreement empowers Ogden to "declare all Obligations of each Debtor to Secured Party immediately due and payable without demand or notice of any kind." (*Id.*) If a default occurs, Ogden has "the remedies of a secured party under the Uniform Commercial Code of Connecticut and any and all rights and remedies available to it under any other applicable law," and Bolin must, if Ogden so requests, "assemble the Collateral and made [sic] it available to Secured Party at a convenient place acceptable to Secured party." (*Id.*)

Finally, section 9 of the security agreement states that "[i]n connection with the exercise of any rights available upon default, Secured Party or its agent may enter upon the premises of Debtor and Debtor expressly waives any and all claims for damage, trespass, or other injury occassioned thereby." (*Id.*) As the secured creditor, Ogden is only obligated to give reasonable notice if she were to sell or otherwise dispose of the collateral she repossessed. (*Id.*) The security agreement imposed no duty on Ogden to notify Bolin before repossessing collateral.

In July 2002, shortly after Ogden made her loan to Bolin, Ogden, Ulanoff, and Nick Dubiago, Ogden's personal accountant, met to discuss the possibility of Ogden joining Bolin as a principal. Dubiago informed Ulanoff and Ogden that he could not recommend whether Ogden should join without a better understanding of the store's financial shape, which was not possible

at the time of the meeting because Bolin's financial records were incomplete and disorganized. On Ogden's advice, Ulanoff retained Dubiago to analyze Bolin's inventory and sales records, as well as the store's bank accounts. Dubiago referred Peter Santiago, a bookkeeper, to Ulanoff to organize Bolin's financial records. Ulanoff hired Santiago, and he worked part-time for Bolin from August 2002 until February 2003. Principally, Santiago was responsible for ordering Bolin's existing records, installing an electronic bookkeeping system, and entering all of the store's records from Bolin's opening to the then-present time into that newly installed bookkeeping system.

The electronic bookkeeping system that Dubiago installed and updated was different than the electronic jewelry inventory system that Bolin had installed when the store first opened. The inventory system accounted for what jewels were in the store, what jewels had been sold or loaned out of the store, and whether the jewelry in the store was owned by Bolin or was held on consignment. It also included price information: namely, the jewelry's at-cost value and its desired retail value.[5] By contrast, the bookkeeping system that Santiago installed accounted for moneys Bolin received and had in its bank accounts, as well as moneys the store owed to others. Ideally, the data in the inventory and bookkeeping systems should correspond to each other, and the inventory held in the store should be reflected in Bolin's accounting books. But that did not occur when Santiago finished installing and updating Bolin's bookkeeping program.

Santiago faced problems collecting and entering data about Bolin's past cash sales from

---

[5] The standard retail value was a 120 percent markup of an item's at-cost value. Thus, an item with a $1,000 at-cost value would have a standard retail value of $2,200. This was only the standard retail value, however. Bolin did not always sell its jewelry at this suggested price. Rather, the store regularly sold jewelry for less than the standard markup. Ulanoff's approval was necessary for selling any item below the standard retail value.

the store's receipts and account records. Although credit card transactions were well recorded, the cash transactions for jewelry often lacked documentation and did not correspond to credited and debited payments in the store's electronic inventory system. Santiago entered the data into his bookkeeping system by assuming that cash deposits in Bolin's accounts were payments from jewelry sales, and not loans. In the course of his investigation of Bolin's financial records, Santiago found many records that were unmarked or unexplained; those numbers were collected in a "garbage account" that Santiago created in the course of reviewing and entering the store's data. By the end of his accounting for 2003, there was well over $1 million in credited and debited entries in this garbage account. (Ex. 111.) Santiago also observed that the credited sales totals he identified were greater than the sales totals identified in the electronic inventory system that Bolin had reported in its tax returns for 2000 and 2001; in other words, Bolin's accounting records revealed more cash coming into the store than did Bolin's electronic inventory system. Finally, he noted that Bolin regularly bounced checks and had liquidity problems.

In order to address the inconsistencies between Bolin's accounting and inventory data, Santiago recommended that Bolin take a physical inventory of its jewelry. In a fax sent to Ulanoff in November 2002, Santiago said that his bookkeeping would be "meaningless" without taking physical stock of the items in Bolin's possession. (Ex. 115.) Santiago was never able to perform such an inventory, however. Ulanoff never made time for him to physically sort through the store's jewelry. Although she never gave Santiago a reason for why she did not want Bolin's jewelry to be properly inventoried, Santiago testified that she seemed reluctant to have a physical inventory taken.

After Santiago completed Bolin's electronic inventory system, Dubiago reviewed Bolin's

financial records and produced Bolin's sales tax returns.  Santiago informed Dubiago that the quality of the data was suspect, but was sufficiently credible to serve as the basis for the store's tax returns.  In filing the tax returns, Dubiago, like Santiago, noticed glaring inconsistencies between Bolin's electronic inventory system and the store's accounting books.  For instance, for the 2003 fiscal year, Dubiago found that there was $1,321,358.45 of debited store inventory in Bolin's electronic inventory system, but only $721,236.98 for debited entries in the company's accounting records.  (Ex. 110.)  Dubiago had to adjust the sales tax return by more than $600,000 in order to bridge this gap in the amount of the store's claimed spending for the year.  (*Id.*)

By producing Bolin's tax returns, Dubiago learned that the store was failing.  On that basis, Dubiago recommended that Ogden reject Ulanoff's offer of membership in Bolin.  Ogden took her accountant's advice.  She never joined Bolin as a partner or manager, and her name was never added to the company's operating agreement.  Furthermore, Ogden never exercised control over the store's business – she never set employee schedules, approved the buying or selling of merchandise, or authorized payments to vendors or contractors.  Rather, she participated in Bolin exclusively as a creditor.

Ogden did perform several informal tasks for Bolin, however.  She made recommendations to Ulanoff about how to improve the store.  For instance, Ogden suggested Dubiago as an accountant to Ulanoff, and recommended other service providers, such as window washers, for Bolin.  There is no evidence, however, that Ogden did anything more than refer these people and service providers to Bolin; she did not hire them on Bolin's behalf or pay them to perform their work.  Ogden also advised Ulanoff to renovate and redecorate the store to make it more elegant and appealing to wealthier clientele.  Ulanoff agreed with Ogden and renovated

the store accordingly in 2003; the store was shut down for six weeks during that time. But Ogden did not hire or contract with anyone on Bolin's behalf or pay for the renovations and redecorating. The evidence only shows that she provided advice to Ulanoff about those store improvements.

Ogden sometimes worked Bolin's sales floor, greeting and assisting customers. There is nothing indicating that she was ever paid for those services. Ogden also helped Ulanoff recruit new customers for the store, primarily by accompanying Ulanoff to offsite jewelry showings, some as far away as Nantucket, Massachusetts, and Fisher's Island, New York. In several cases, Ogden organized jewelry shows for Bolin – in flyers for several of the events, she is billed as the show's promoter (ex. 1007) – and for at least one jewelry show, Ulanoff was not present with Ogden. Nonetheless, all of the decisions whether and when to hold a show were left to Ulanoff. Ogden never had authority or approval to take jewelry or host an event for Bolin without first obtaining Ulanoff's permission.

Finally, Ogden referred her friend, Shannon Howey, to Ulanoff as a potential employee for the store. Ulanoff hired Howey between July 2002 and January 2003 – Howey never testified and there are conflicting dates regarding her hiring – to be responsible for managing the store's inventory. Her job was to keep track of what items were for sale in the store, what items had been sold or were loaned out on consignment, and which items in Bolin's possession were owned, on consignment, or in the shop for repairs. Bolin paid Howey $50,000 in annual salary.

Unlanoff promoted Howey to store manager in January 2004. Her responsibilities expanded from managing Bolin's inventory to handling other tasks, such as overseeing the store during working hours and maintaining contact with the store's vendors. Despite her promotion,

she was not allowed to purchase merchandise for the store, agree to sell a piece of jewelry on consignment, or permit pieces of jewelry to be loaned out of the store or be returned to vendors. Only Ulanoff could decide those matters. When the store closed for extended periods – e.g., for renovations or vacation – Howey was responsible for sending consignment items back to vendors, but acted only at the direction of Ulanoff.

c.      Bolin's pawning activity

Throughout its existence, Bolin had major problems with its cash flow. In order to increase Bolin's liquidity and free enough cash for payments owed to jewelers, the store's short-term expenses, and even their own compensation, Ulanoff and Citrin frequently pawned the store's jewelry, including its pieces held on consignment. Ulanoff believed that pawning inventory was a common business practice in the jewelry business. Furthermore, she claims that a number of her vendors were aware that she pawned jewelry in Bolin's possession in order to increase the store's cash flow, and that those vendors acquiesced in this practice. There is no other evidence to support those contentions, however. Bolin's pawning tended to increase in the summer, when sales were at their lowest; spikes in pawning activity also correlated with the periods when Ulanoff was unable to borrow funds from other sources.

By July 2004, Bolin was pawning consigned jewelry two to three times every week. Their pawnbrokers of choice were the Provident Loan Society ("Provident"), 48th Street Pawnbrokers ("48th Street"), and G. Modell, Incorporated ("Modell"), of all of which were based in New York City. Each time Ulanoff and Citrin pawned a piece of jewelry, they received a receipt that stated the item that had been pawned, the terms and conditions of its redemption, and the amount of time that Bolin had to redeem the item before the pawnbroker auctioned it. Those

receipts are referred to as "pawn tickets." Shannon Howey was responsible for tracking and accounting for the jewels that were pawned and the cash that Bolin received as loans from pawnbrokers. Although Howey never testified at trial, the testimony of others, such as Nick Dubiago and Peter Santiago, suggests that Howey designated the cash loans as payments in the store's accounts, and thus treated the pawned jewelry as if it had been sold and not put up as collateral for loans. But Howey did not remove the pawned jewelry from the store's internal inventory system; according to Ulanoff, the inventory system did not include a field that permitted Howey to designate whether an item belonging to Bolin had been lent out of the store. That accounting explains why the credited payments in Santiago's bookkeeping system reflected greater payments than represented in the inventory system – in Bolin's accounting, the loans were treated as cash payments for pieces, while the electronic inventory system continued to treat the items as if they had not been sold but were in Bolin's possession. As a result, Bolin's accounts overstated the store's sales and understated its liabilities, and Bolin's inventories of the jewels in its possession were inaccurate.

The total amount of pawn debt that Bolin incurred is not known precisely. On Bolin's bankruptcy filings, for instance, the secured loans held by Provident, 48th Street, and Modell are not reported. By the time of Bolin's closing at the end of July 2004, Andrea Ulanoff estimates that she had pawned about $180,000 in jewels. John Kramer, Ogden's valuation expert, calculated that Ulanoff owed $312,703.84 in pawn debt – $279,157.00 in principal and $56,178.60 in interest – on the basis of the pawn records that were recovered after Bolin's closing and bankruptcy filing. (Ex. 1025.)

Sally Ogden eventually learned of Bolin's pawning and met with her attorney, Brian

O'Connor, on March 30, 2004, to discuss its implications for her. At that meeting, Ogden told O'Connor that she had lent $425,000 to Bolin; she did not remember whether she had a security agreement protecting any of the money she loaned. O'Connor offered to conduct a UCC search for her to see whether any note or agreement had been filed with the Connecticut Secretary of State securing her loan. O'Connor and Ogden also discussed the legality of Ulanoff's alleged pawning – O'Connor said that it was likely inappropriate for Ulanoff to pawn pieces that the store did not own, but also said that he had not researched the subject. He did not counsel Ogden to demand repayment of her loan or take any self-help steps. O'Connor submitted a UCC search request after the meeting and received the results the following day, March 31, 2004. (Ex. 148.) He found that Ogden and Sylvia Ulanoff both had made secured loans to Bolin. O'Connor did not speak with Ogden again or reveal the results of the UCC search until July 28, 2004.

   2. *Bolin's closing*

  On Friday, July 23, 2004, Andrea Ulanoff and Noah Citrin flew to Italy for a two-week vacation and to look for jewelry to buy for Bolin. That day, prior to leaving for Italy, Ulanoff was busy at the store contacting customers and vendors to pick up jewelry, and paying bills that were outstanding or coming due. Also in the store were Shannon Howey and Kathleen Raby. Sometime that day, a vendor entered the store demanding payment on an outstanding bill for a piece of jewelry he sold Bolin; the store owed half of the item's wholesale price. The vendor was heated and verbally aggressive with Bolin's staff. Although Ulanoff tried to assure the vendor that the remaining balance would be paid shortly, she was unable to assuage the vendor. Eventually, the Greenwich police were called and the vendor was escorted from the store. Howey and Raby were disturbed by the event; Ulanoff, however, treated it as a normal

consequence of doing business in the jewelry industry.

While Ulanoff was in Italy, she maintained contact with the store. On Wednesday, July 28, 2004, she sent a fax from her hotel to Bolin requesting that Howey handle several financial matters – namely, transferring funds between Bolin's accounts, stopping payment on several checks, and writing a check to pay the store's rent. Ulanoff also told Howey to return pieces of jewelry that Bolin borrowed for a jewelry showing that the store held in Nantucket before Ulanoff left for Italy. Howey never transferred the funds or paid the rent as Ulanoff asked. When Ulanoff and Citrin left for vacation, Bolin did not have any cash on hand to pay its bills; a Bolin account with the Connecticut Community Bank was $10,000 overdrawn. (Ex. 465.)

On Wednesday, July 28, Ogden came to Bolin to collect jeweled clips that were being repaired by Citrin. Howey let her in and permitted her to search the store for the clips; Howey also looked for the clips but did not find them. Howey told Ogden that they may have fallen in the store's "black hole," a euphemism for being pawned. Howey then told Ogden about Ulanoff's pawning, the vendors who were calling about late payments, and the store's empty and overdrawn bank accounts. Ogden, who was already aware of Bolin's pawning habit, believed that Bolin's demise was imminent and became worried not only for her clips but for the security of her loan. At about 3:15 that afternoon, Ogden called Brian O'Connor at his office out of concern that Bolin was failing and that her loans were unprotected. O'Connor told Ogden that she was a secured creditor and had rights in the collateral, but cautioned that he had not reviewed her file recently and did not remember what her exact rights were. Following her call with O'Connor, Ogden asked Howey to pack the Bolin-owned jewelry. At Ogden's direction, Howey also went about creating an inventory of all of the store-owned jewelry she was packing. Ogden

then left the store.

The next morning, July 29, Ogden returned to look for her jeweled clips again.  When she arrived, Howey was still packing up the owned inventory as Ogden had requested before leaving the night before.  In the course of her search, Ogden claims that she found the collection of Ulanoff's and Citrin's pawn tickets in a folder or in an unlocked part of Andrea Ulanoff's desk.  Ogden then says that she asked Howey about the pawn tickets, and Howey told her that some were tickets for consigned items that Ulanoff and Citrin had hocked.  Ulanoff testified that this likely happened differently – she claims that the pawn tickets were actually locked in Howey's file cabinet, and that Howey must have given Ogden the pawn tickets.  Ulanoff's testimony is more persuasive.  It is unlikely that Ulanoff would leave the pawn tickets, evidence of illegal conduct, in a place easily accessible to others.  Moreover, Ogden already knew about the pawn tickets and had previously discussed them with Howey.  It is more likely that Howey simply gave the tickets to Ogden than that Ogden innocently stumbled over them in her search for her mother's jewelry.  The evidence shows, generally, that Ogden and Howey acted in concert.

As early as July 27, 2004, Howey had begun contacting vendors whose jewels she suspected had been pawned; Ogden became deeply involved in that activity as early as July 28.  Howey made some records of the items that they returned to vendors between July 27 and July 30, 2008, none of which were authorized by Ulanoff.  (Ex. 1A.)  For instance, inventory records introduced at trial show consigned pieces that were returned to Emsaru USA Corp. ("Emsaru"), a Bolin vendor, on July 30.  (Ex. 40.)  Records of Bolin's outgoing phone calls confirm that vendors were being contacted from the store beginning on July 27.  (Ex. 1020.)  One phone call, made on July 30, was to John Shaban, an attorney for Phipp's Jewelers, a vendor that sold and

consigned jewelry to Bolin.  (Ex. 1A)  As of July 30, Ulanoff did not know Shaban, and his phone number would not have been available in the store's records; Howey or Ogden learned of Shaban independently of Ulanoff.  Bolin vendors were contacted during this period from other phone lines, too.  Records from a cell phone owned by Denny Ogden, Sally Ogden's then-husband, show that phone calls were made to Bolin vendors, such as Carol Goldstein, Perle Di Piranesi, and Emsaru, on July 29 and 30; those phone calls were made by Ogden.  (Ex. 418.) Vendors who were contacted from Bolin's office line or Ogden's cell phone also left messages on Bolin's answering machine on Friday, July 30.  Ulanoff heard those messages after she returned to the store and described them as sounding emotional, desperate, and shocked.[6]

At about 5:30 p.m. on July 29, 2004, after Ogden had discovered the folder of Bolin's pawn tickets, Ogden and Howey went to the Greenwich Police Department to report the pawn tickets.  They visited the police department because Ogden believed, on the basis of her prior conversation with her attorney, that Bolin's pawning constituted a crime.  At the Greenwich Police Department, Ogden and Howey met with Detective Harold Munrow and informed him that Ulanoff and Citrin had been pawning jewels consigned to Bolin.  Howey was hysterical during the meeting, and Ogden did much of the talking.  Ogden told Munrow that she was a large investor in Bolin and that she had learned of possible criminal activity taking place there – namely, pawning of unowned jewelry.  She provided Munrow with the folder containing the pawn tickets, invoices from jewelers for consigned pieces and from customers for jewelry repairs, and photographs of some of the consigned jewelry that Ulanoff and Citrin allegedly

---

[6] On objection from defense counsel, I excluded the contents of these phone messages as hearsay.

pawned.  Munrow photocopied all of those documents.  Ogden also told Munrow that she had

left her jeweled clips with Bolin and that they had not been returned for more than a year; she

expressed concern that Ulanoff pawned them.  Ogden never informed Munrow that she and

Howey had begun returning jewelry to vendors and were planning to continue doing so.

Munrow did not instruct Ogden or Howey to take any jewels or return anything to

vendors.  Nor did he advise Howey about quitting her job or about Ogden's rights to repossess

collateral under the terms of her security agreement.  Munrow did tell Ogden and Howey not to

give the pawn tickets to anyone else, and advised Ogden that any jewelry vendors should contact

him with regards to obtaining their consigned items.  He and the Greenwich Police Department

also began contacting vendors themselves, and he notified Bolin's pawnbrokers to freeze the

Bolin jewelry in their possession.  Howey returned to the store that night, and Ogden went home

with the folder of pawn tickets.  Howey made more phone calls that night from the store between

7 and 8:30 p.m., including to Ogden's cell phone and to vendors.

On Friday, July 30, a number of vendors and customers came to Bolin to reclaim their

jewelry.  Vendors also began coming to the Greenwich Police Department on Friday, July 30.

Some of those vendors had been contacted by Howey, Ogden, or Munrow; others found out

about Bolin's pawning activity by word of mouth.  Joel Liffman was one such customer who

came to Bolin and the Greenwich Police Department that day.  Ulanoff and Liffman had

previously visited a jewelry vendor in New York.  On the basis of that visit, he deposited money

with Ulanoff to acquire about $50,000 of jewelry on his behalf; Liffman agreed to pay a premium

to Ulanoff for her service.  Liffman received a phone call on Friday morning about allegations

that Bolin had been pawning jewelry and that Ulanoff had disappeared.  He visited the store at

noon to make sure that the jewelry he had arranged for Ulanoff to buy had not been pawned. He was in Bolin on July 30 for half an hour.

When Liffman arrived at the store, he found Howey and Ogden as well as an unidentified person inspecting jewelry. He asked Howey and Ogden how many other concerned vendors and customers they had spoken with that afternoon; they replied that they had only spoken with one – namely, the person who was in the store when Liffman arrived. Liffman saw that many pieces of jewelry were out of their cases and were spread out on trays atop the store's counters. Liffman became concerned that his jewelry was among the items that were out of their cases. Liffman asked Howey and Ogden for his records relating to his purchases, which Ogden gave him. After discovering that his jewels were missing, Liffman filed a complaint with the Greenwich Police Department. The Greenwich Police would later inform him, after its investigation, that his jewelry was located in a New York pawn shop. Sometime later in the day, an officer from the Greenwich Police Department arrived at Bolin. But when Liffman had visited the store, there was no officer on the scene.

Brian O'Connor spoke with Ogden on July 30 to follow up on their discussion of the security of Ogden's loan to Bolin. O'Connor reported to Ogden what he found in conducting his UCC search and said that he had located a promissory note entitling her to collateral in the event of default. The promissory note he uncovered was for $500,000, and was not the correct, amended $270,000 note. He also advised her that the promissory note defined default as Bolin's failure to pay Ogden within five days of receiving notice that payment was due. O'Connor told Ogden that only after the five days had expired could she repossess collateral in order to secure her loan.

O'Connor counseled Ogden to be careful to take actions consistent with being Bolin's creditor, and not the store's manager or owner; furthermore, he advised Ogden not to remove anything from the store until the five-day waiting period had expired. O'Connor did not tell Ogden anything about returning items to vendors or creditors. He also said that if she repossessed any items from the store, she should take an independent inventory with a witness present. Neither O'Connor nor Ogden knew of Sylvia Ulanoff's loan to Bolin or about any other loans that were of a higher priority than Ogden's. Before their phone call ended, O'Connor agreed to write a letter on Ogden's behalf demanding that Ulanoff repay Ogden her loan. O'Connor wrote and faxed the letter to Bolin that same day.

At the end of the day of July 30, Howey and Ogden arranged the jewelry in the store that had not been claimed by or returned to vendors. Ogden asked Howey to separate the store-owned jewelry from the pieces Bolin held on consignment. Howey placed the jewelry she identified as store-owned in thirteen envelopes and inventoried them; together, the jewelry was worth $607,645.60 at cost. (Ex. 1002.) Neither Howey nor Ogden photographed this jewelry or took other steps to document it. Ogden also took the store's two computers and several books from the store's shelves. Ogden took the jewels and Bolin property to her Greenwich home and placed them in her bedroom, where she had left the pawn tickets the night before. She placed as many jewels as she could in her personal safe. The only people who had access to her room from the time she placed the jewels there and returned them were she and her husband. There were contractors painting her house during this period, however, and it is possible that one or more of these workers entered her bedroom even though it was not being painted. No evidence was introduced that any painters did, in fact, enter the bedroom or come into contact with the Bolin

property stored there.

Before leaving on Friday evening, Howey hung a typed note from Bolin's front door reading: "TO OUR CUSTOMERS / BOLIN IS CLOSING IT'S [sic] DOORS / FOR INFORMATION CALL [redacted Ulanoff cell phone number] OR [redacted Ulanoff home phone number]. / WE ARE SORRY FOR ANY / INCONVENICE [sic]." (Ex. 73.) Ogden also left the demand letter that O'Connor had signed and faxed. Howey closed and locked the store, which, after her and Ogden's efforts, had been mostly emptied.

While Howey and Ogden were emptying Bolin's inventory, Ulanoff's father passed away on July 28 in Florida. Ulanoff was notified of this while in Italy. With Howey's assistance, Ulanoff scheduled a flight to Florida for the next day, July 29; because of complications in the travel arrangements, she did not arrive in Florida until Friday, July 30. On the morning of July 30, Howey called Ulanoff's cell phone. Howey first told Ulanoff that Sally Ogden had come to the store looking for her jeweled clips. Ulanoff told Howey that the clips were in the basement safe, where Noah Citrin had left them; she then told Howey to return the clips to Ogden. Howey then informed Ulanoff that she was quitting her position as Bolin's manager. Distraught over her father's death, Ulanoff was unable to talk Howey out of her decision; instead, she accepted Howey's resignation and told her to close the store for the rest of the day. At 6:45 p.m. that night, Howey sent a fax to Greenwich Bank & Trust, where Bolin held an account, informing the bank that she had quit her job at Bolin and asking to be removed as a signatory to Bolin's accounts. (Ex. 39.)

Ulanoff returned to Greenwich following her father's funeral on the night of Saturday, July 31, 2004. When she returned, she had a message on her cell phone from Ogden demanding

payment of $400,000 and threatening litigation if she did not receive the payment immediately. Ulanoff visited Bolin on Sunday, August 1, 2004, the morning after she returned to Greenwich. When she arrived at Bolin, she found the out-of-business sign tacked to the front door. Inside the store, Ulanoff found papers strewn about, files open, the store's computers and several books gone, and little to no jewelry in the cases or safes. She also found the demand letter written by Brian O'Connor. The letter stated that the principal Ulanoff owed to Ogden was $425,000 and that if Ulanoff did not pay within five days, Ogden would "take all necessary action to enforce collection on [the] note." (Ex. 429A.)

After visiting the store, Ulanoff met with her attorney, Phillip Russell, and brought Ogden's demand letter with her. Russell contacted O'Connor and told him that Ulanoff would permit Ogden to take property from the store as collateral for her loan. On August 5, 2004, Russell faxed a letter to O'Connor granting Ulanoff's permission to Ogden to enter Bolin and "take whatever steps she deems necessary to preserve" any remaining assets. (Ex. 157.) During this time, vendors continued visiting Bolin and attempting to find their jewels. John Shaban, an attorney representing Phipp's Jewelers, reported lost jewelry to the Greenwich Police Department on August 3, 2004, after being tipped off about Bolin's pawning by Ogden.

On the eve of August 1, 2004, Ulanoff, exhausted and grieving, attempted suicide and was hospitalized. She was not released until August 10, 2004. Bolin remained closed throughout this period. It would never reopen.

3. *Aftermath of Bolin's closing*

On August 17, 2004, Ulanoff met with Nick Dubiago, Bolin's retained accountant. During the meeting, Ulanoff explained the events that had transpired during the week of July 26,

2004 and that Ogden and Howey had taken Bolin's jewelry and put the store out of business. She also admitted to Dubiago that she had been pawning jewelry to pay for Bolin's liabilities and expenses, including her own compensation. Dubiago told her that had he known that, he would have included the pawning as liabilities on Bolin's tax returns. Ulanoff also told Dubiago that her car had recently been repossessed and that she was worried about being arrested for the pawning.[7] After meeting with Ulanoff, Dubiago spoke with Ogden by phone. Ogden confirmed that she had taken jewelry from Bolin but insisted that she had returned all of the consigned jewelry to the vendors. She also said that the store-owned jewelry in her possession was worth only about $200,000. Ogden also told Dubiago that she had taken the jewelry and closed the store based on O'Connor's advice.

Bolin filed for Chapter 7 bankruptcy on August 20, 2004. Michael Daly was appointed the bankruptcy trustee. Daly visited the locked Bolin store with Detective Munrow on September 9, 2004 and found the store-closing sign still hanging from the front door. Inside, Daly discovered a store that was largely empty and without inventory for sale; Bolin's safes held little other than loose stones and jewelry that was unfinished or being repaired. Daly did not find Bolin's computers or books.

Daly spoke with Ulanoff and found out that Ogden had taken much of Bolin's owned jewelry. Daly then contacted Brian O'Connor to retrieve Bolin's jewelry. That was the first notice O'Connor received of Ogden's repossession of collateral from Bolin. Through O'Connor, Daly got in contact with Ogden and demanded that she return Bolin's computers to him so that

---

[7] Ulanoff was prosecuted and ultimately convicted because of her pawning. She received a suspended sentence and 5 years' probation; she was also ordered to pay $120,000 in restitution to Bolin's creditors. Her probation period ended upon payment of the full restitution.

he could access the store's electronic inventory system and assess the extent of Bolin's inventory, what was missing, and what could be liquidated. Ogden complied and brought Daly the two computers she took from the store on July 30, 2004. Searching through the inventory system with Andrea Ulanoff, Daly found 192 items of jewelry that were returned to vendors on July 28, 29, and 30, totaling $691,091.80 on an at-cost basis.

Ogden returned the jewelry she had taken to Daly in February or March of 2005, after Ogden had changed her attorney and her new counsel reached a stipulation with Daly about the items that Ogden had in her possession. Working with Detective Munrow, Daly photographed and labeled all of the jewelry that Ogden provided and then compared the pieces to the records in Bolin's electronic inventory system. He found that there were pieces of Bolin-owned jewelry still missing after Ogden returned all of the jewels; similarly, Daly's search revealed that Ogden had taken items of jewelry that were not included in Bolin's records of store-owned inventory.

Daly knew that Bolin jewelry had been pawned and that pieces were still waiting to be redeemed. But it was difficult to determine what pieces had been pawned – pawned jewelry was listed in the store's inventory as if it were still in Bolin's possession. The bankruptcy estate, moreover, had no funds to redeem the jewelry it confirmed had been pawned, despite efforts that Daly took to recover $160,000 in accounts receivable due to Bolin. The jewelry that Ulanoff and Citrin pawned, therefore, remained in the possession of the pawnbrokers and could not be secured and liquidated by the bankruptcy trustee.

After securing the owned inventory that Ogden returned, Daly took steps to liquidate the remaining jewels that Bolin owned. First, he offered the jewelry for appraisal and sale. The first appraisal he received valued the entire collection at $25,000, which Daly rejected. Daly next

attempted to consign the jewelry, which proved more successful. Using a jewelry wholesaler whom he knew personally, Daly was able to liquidate some of Bolin's jewelry for approximately $88,000, although Daly received only about $66,000 after paying the wholesaler's commission. Daly estimates that the wholesaler has another $50,000 worth of jewelry to be sold on consignment. For the Bolin jewelry that the wholesaler refused to sell on consignment, Daly found a retailer who agreed to buy or sell on consignment the remaining items for about $24,000.

Daly never considered selling the business as a whole instead of the individual jewelry that Bolin owned. It was his opinion that Bolin did not own enough jewelry to be a credible jewelry retailer in Greenwich, and lacked much goodwill after the store's messy demise. Daly characterized the process of liquidating Bolin as "total chaos." The property that could be sold was disorganized and Bolin's records were convoluted and incomplete. Furthermore, the value of the jewelry had sunk considerably because of the delay between the bankruptcy and the eventual liquidation. Jewelry buyers, in Daly's view, understood that the bankruptcy estate was in duress and, therefore, Bolin would be forced to accept lower offers for its inventory.

B.     Conclusions of Law

The Bankruptcy Trustee alleges the following causes of action against Sally Ogden: tortious interference with Bolin's ongoing business (Count One), conversion of Bolin's property (Counts Two and Three), violation of the Connecticut Unfair Trade Practices Act (CUTPA) (Count Four), wrongful repossession of Bolin's property in violation of the security agreement (Counts Five, Six, and Seven),[8] trespass (Count Eight), statutory theft (Count Eleven), and

_____

[8] Count Seven of the Trustee's Complaint is designated as "Failure to Act in a Commercially Reasonable Manner" and not as wrongful repossession. The thrust of the claim, however, is that Ogden's actions during the week of July 26, 2004 exceeded what she was

subordination of debt (Count Thirteen).[9]  The Trustee claims damages for each of these theories

of liability.  For ease of analysis, I am dividing these claims into four groups: (1) a claim for

damages based on Ogden's unfair trade practices; (2) claims for damages based on Ogden's

repossession of Bolin's owned inventory; (3) a claim for damages based on Ogden's returning of

consigned jewelry to the original vendors; and (4) a claim for equitable subordination of Ogden's

interests in Bolin's bankruptcy.  After discussing those claims, I turn to the facts and legal

analysis concerning damages.

1.      *Unfair trade practices claim*

The Bankruptcy Trustee has alleged that Ogden's conduct constituted an unfair trade

practice in violation of CUTPA, which prohibits engaging in "unfair methods of competition and

unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat.

§ 42-110b(a).  "Trade or commerce" means "the advertising, the sale or rent or lease, the offering

for sale or rent or lease, or the distribution of any services and any property, tangible or

intangible, real, personal or mixed, and any other article, commodity or thing of value in this

state."  Conn. Gen. Stat. § 42-110a(4).  Whether an act or practice that occurs in the conduct of a

trade or commerce is "unfair or deceptive" depends on the following three-factor test, known

colloquially as the "cigarette rule": (1) the act or practice must offend public policy; (2) it must

_____

permitted to do under the Uniform Commercial Code of Connecticut and the private security
agreement between her and Bolin.  I am therefore considering it as one aspect of the Trustee's
wrongful repossession liability theory, especially in light of the fact that the Trustee already
collapsed Count Seven into the wrongful repossession claim in its briefing.  *See* Joint Pretrial
Memo., at 4 (Doc. # 37) (including claim of wrongful repossession but no claim of failure to act
in a commercially unreasonable manner).

[9] The Plaintiff did not pursue Counts Nine, Ten, or Twelve of the Complaint at trial.  *Id.*
Accordingly, they are deemed abandoned.

be immoral, unethical, oppressive, or unscrupulous; and (3) it must cause substantial damage to consumers, competitors, or other businesspeople. *Associated Inv. Co. Ltd. P'ship v. Williams Assocs. IV*, 645 A.2d 505, 509 (Conn. 1994).

The Trustee argues that Ogden was engaged in the trade or commerce of jewelry retailing – that is, the plaintiff claims that Ogden was engaged in Bolin's business as a manager and principal – and that Ogden's actions to take possession of store inventory, return consigned items to vendors, and effectively shut down the store were "unfair and deceptive acts" under CUTPA. Alternatively, the Trustee argues that Ogden was involved in trade or commerce because she loaned money to Bolin, and, in her capacity as a creditor, violated CUTPA by participating in the events that led to Bolin's closing.

The Trustee cannot succeed on the CUTPA claim, however, because he has failed to establish that Ogden was engaged in trade or commerce. "Trade or commerce," as the term is used in CUTPA, implies more than one act in a line of business and excludes conduct undertaken in the course of a secondary line of work. Rather, a person's conduct is subject to the statute only when her acts are performed within her "primary trade or commerce"; "activities that are incidental to that primary trade or commerce" are not actionable under the statute. *Sovereign Bank v. Licata*, 977 A.2d 228, 238 (Conn. App. Ct. 2009) (citing *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 890 A.2d 140, 163-64 (Conn. App. Ct. 2007)); *Cornerstone Realty, Inc. v. Dresser Rand Co.*, 993 F. Supp. 107, 113 (D. Conn. 1998).[10]

---

[10] In a previous decision, I noted in dicta that Connecticut superior courts sometimes permit CUTPA claims for conduct not occurring in a defendant's primary line of business. *Omega S.A. v. Omega Eng'g, Inc.*, No. 3:01cv2104 (SRU), 2005 WL 3307277, at *8 (D. Conn. Dec. 6, 2005). Since that decision, two Connecticut Appellate Court opinions have adopted the "primary trade or commerce" or "primary line of business" test. *See Sovereign Bank*, 978 A.2d

Ogden did not violate CUTPA because, under either of the plaintiff's theories, she was not engaged in "trade or commerce." First, the Trustee did not meet his burden to establish that Ogden was a manager or otherwise involved in Bolin's jewelry business. The evidence submitted at trial shows that Ogden made a loan of $270,000 in November 2002 and, at the same time, submitted an application for key man insurance. Although Ogden did give business suggestions to Ulanoff and volunteer her time to the store by working its sales floor and participating in offsite jewelry shows, the Trustee did not show that Ogden was anything more than an advisor to Bolin. She was not a manager, employee, or agent of the store. Ogden was merely a creditor to the business, not a member of it.

Ogden's conduct as a creditor is also insufficient to establish a CUTPA violation. Ogden performed several, limited actions as a creditor: she loaned $270,00 to Bolin, she submitted a key man insurance application, and, as explained in the following section, she went to Bolin to reclaim collateral when the store defaulted on her loan. There is no evidence showing that Ogden did more than this: she did not make other secured loans to the store, and there is no record or testimony of her making similar loans to other businesses. The loan was an unusual action for Ogden to take. Ogden, the record shows, was a housewife living in Greenwich who had some previous retail experience; for her, lending money to Bolin was a singular act without precedent. Ogden's loan to Bolin, therefore, does not establish the "trade or commerce" element necessary to establish a CUTPA violation. *See Sovereign Bank*, 977 A.2d at 238 (denying CUTPA claim stemming from a mortgage loan when no evidence was submitted showing that

_____

228; *McCann Real Equities*, 890 A.2d 140. In light of that development in the state appellate courts, I hold that CUTPA's phrase "trade or commerce" refers to a person's primary business, and not any business in which she particpates.

lender "ever had, prior to the transaction or thereafter, engaged in the mortgage business").

Neither Sally Ogden's involvement in Bolin nor her loan to the store qualifies as engaging in "trade or commerce" for which she can be liable under CUTPA. For that reason, and without examining whether her actions were "unfair or deceptive" and whether Bolin was a "consumer, competitor, or businessman" covered by the cigarette rule, I conclude that the Trustee has failed to meet his burden of proof that Ogden committed an unfair trade practice. Ogden is not liable on this count.

### 2. *Claims arising from Ogden's repossession of Bolin jewelry*

The Bankruptcy Trustee next alleges several causes of action against Sally Ogden for her taking possession of Bolin's jewelry during the week of July 26, 2004. Those causes of action are the Trustee's claims of trespass, conversion, wrongful repossession, and statutory theft. All of those claims are variations on the allegation that Ogden unlawfully entered Bolin's premises and took the store's property without permission. Trespass is a cause of action for Sally Ogden's unlawful entry on Bolin's premises;[11] conversion is a cause of action for Ogden's unlawful possession of property that belonged to Bolin;[12] wrongful repossession is a cause of action alleging that Ogden breached the terms of her security agreement with Bolin when she reclaimed

---

[11] To prevail on a claim of trespass, the Trustee must prove that (1) Bolin owned or had a possessory interest in the property, (2) Ogden entered the property in a way that affected Bolin's ownership or possessory interest, (3) Ogden acted intentionally, and (4) Ogden's intentional entry caused injury to Bolin. *City of Bristol v. Tilcon Minerals, Inc.*, 931 A.2d 237, 258 (Conn. 2007).

[12] To prevail on a claim of conversion, the Trustee must prove that (1) the items Ogden took belonged to Bolin, (2) Ogden deprived Bolin of the items for an indefinite period of time, (3) Ogden's conduct was not authorized, and (4) Ogden's conduct harmed Bolin. *Label Sys. Corp. v. Aghamohammadi*, 852 A.2d 703, 729 (Conn. 2004).

her collateral;[13] and statutory theft is, essentially, conversion with an additional showing that Ogden's taking of possession was intentional or malicious.[14] To all of those causes of action, Ogden pleads that Bolin defaulted on her security agreement and, therefore, she was within her rights, as prescribed in the same security agreement, to repossess Bolin's property as collateral.

Ogden held two instruments that protected her $270,000 loan to Bolin: a promissory note and a security agreement. The promissory note and security agreement entitled Ogden to different rights with respect to Bolin's default. The promissory note defined a default as Bolin's failure to repay Ogden's loan within five days of her demand, while the security agreement had a broader definition of circumstances amounting to default. The security agreement also granted Ogden a wider array of remedies in the event of Bolin's default, including repossession of collateral without a judicial proceeding. Ogden relies on the security agreement, and not the promissory note, to defend against the Trustee's claims relating to her repossession of Bolin property.

Secured transactions are governed by the Uniform Commercial Code ("UCC"), as adopted by the Connecticut legislature. That law gives leeway for parties to alter and vary their rights and responsibilities from what the UCC dictates for secured transactions. Parties to a security agreement are permitted to waive and vary the rules that the UCC sets with respect to default and repossession, unless those rules are mandatory. Conn. Gen. Stat. § 42a-9-602; *see*

---

[13] *See* Conn. Gen. Stat. §§ 42a-9-602 & 42a-9-609 (permitting parties to a secured transaction to define secured party's rights upon default, including repossession of collateral).

[14] "[S]tatutory theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion." *Deming v. Nationwide Mut. Ins. Co.*, 905 A.2d 623, 640 (Conn. 2006) (quotation omitted).

*also* § 42a-1-302(a) ("Except as otherwise provided . . . the effect of provisions of this title may be varied by agreement.").  Section 42a-9-602 lists a set of mandatory rules in the UCC that may not be waived or varied in a security agreement.  Nonetheless, the parties to a security agreement may determine their own standards for measuring whether the rights and duties set forth by the mandatory rules have been satisfied, provided that those standards are not "manifestly unreasonable."  Conn. Gen. Stat. § 42-9-603(a).[15]  The upshot is that the security agreement is the primary source for adjudicating Ogden's and Bolin's rights with respect to Ogden's $270,000 loan.  Only when a mandatory rule set forth in section 42a-9-602 applies does the UCC govern, and even then, the parties can determine by contract whether those rules have been satisfied.

Ogden makes two arguments for why the security agreement is a defense against the Trustee's conversion, wrongful repossession, trespass, and statutory theft claims.  Ogden first argues that she was entitled to enter Bolin's premises and take the store's inventory into her possession under section 9 of the security agreement.  That section states in relevant part, "whenever Secured Party feels insecure for any reason whatsoever, Secured Party may, at its option, declare all Obligations of each Debtor to Secured Party immediately due and payable without demand or notice of any kind and the same thereupon shall become due and payable." (Ex. 3.)  Ogden maintains section 9 of the security agreement vested her with rights to possess Bolin's collateral if she believed in good faith that her loan was at risk.  Schedule A of the security agreement defines "collateral" as including Bolin's "inventory," a term referring broadly to "all goods, raw materials, work in process, finished goods, products, merchandise, and other

---

[15]  The exception to that rule is whether repossession of collateral breaches the peace. Parties to a security agreement may not privately contract to determine whether the prohibition of breaching the peace has been met.  Conn. Gen. Stat. § 42a-9-603(b).

tangible personal property now owned or hereafter acquired by Borrower and held for sale or lease or resale . . . or used or consumed in Borrower's business." (*Id.*)  Therefore, Ogden argues, all of the property she removed from the store – namely, jewelry, computers, and books – falls within the definition of property subject to repossession.  In support, Ogden cites Connecticut law that permits a party to exercise an option to accelerate a counterparty's payment or performance when the party "in good faith believes that the prospect of payment or performance is impaired." Conn. Gen. Stat. § 42a-1-309.  Because Ogden had a good faith belief that her loan was insecure – on the basis of what she learned about Bolin's pawning activity and poor financial shape – she concludes that the security agreement entitled her to take Bolin's inventory.

This argument can be rejected without considering whether Ogden, in fact, had a good faith belief that her loan was at risk, a matter contested at trial.  A plain reading of the security agreement shows that the "feels insecure" clause did not entitle Ogden to enter Bolin's premises and take the store's jewelry in her possession, but only permitted her to demand immediate payment on her loan.  The security agreement permits Ogden to enter Bolin's premises and repossess the store's inventory only "[i]n connection with the exercise of any rights available upon default."  As defined in section 8 of the security agreement, Ogden's feeling of insecurity does not constitute an event of default.  Demanding payment, which Ogden was permitted to do because of her feeling of insecurity, is a predicate for default, and not a default in itself.  Bolin would not default under the agreement's terms – and, by extension, Ogden would not be permitted to take any of Bolin's items – until the store failed to meet Ogden's accelerated payment date.  Based on the terms of the promissory note and Ogden's demand letter left for Ulanoff, that would not have occurred until August 4, 2004, five days after July 30, 2004.  Thus,

the "feels insecure" clause of section 9 of the security agreement does not justify or otherwise serve as a defense for Ogden's conduct.

Ogden's second and more convincing argument is that Bolin defaulted on Ogden's loan by pawning jewelry and, as a result, the security agreement entitled her to enter the store and take possession of its inventory. Pawning, Ogden claims, encumbered the store's inventory and resulted in pawnbrokers obtaining liens against the collateral for Ogden's loan. Those encumbrances and liens qualified as default under section 8 of the security agreement. (*See* Ex. 3 ¶ 8 (defining default as an "encumbrance to or of any of the Collateral, or the making of any levy, seizure, or attachment thereof or thereon").) Ogden makes the same argument for the civil judgments that had been awarded against Bolin: because Bolin had several judgments against it, the store had defaulted under that section of the agreement.

Working from the premise that Bolin had defaulted, Ogden argues that the security agreement empowered her to take the store's inventory into her possession. Such self-help was authorized by the security agreement's terms: specifically, the agreement's reference to the "remedies of a secured party under the Uniform Commercial Code of Connecticut" in the event of a default. (Ex. 3.) Under the UCC, a secured party, such as Sally Ogden, has the right "to take possession of the collateral . . . without judicial process" following a debtor's default, provided that the secured party's repossession "proceeds without breach of the peace." Conn. Gen. Stat. § 42a-9-609(a)&(b). Ogden claims that the security agreement, by its incorporation of the UCC and its self-help provisions, permitted her to enter Bolin's premises and take the store's inventory as collateral because of Bolin's pawning and the judgments entered against it.

The Trustee raises three challenges to this defense. First, the Trustee argues that there

was no default. Although section 8 of the Security Agreement states that "encumbrance to or of any of the Collateral, or the making of any levy, seizure, or attachment thereof and thereon" and "the entry of a judgment against any Obligor" shall qualify as a default, the Trustee asserts that section 8 of the Agreement cannot mean what it literally says. Consider, for example, that the section defines a "sale . . . of any of the Collateral" as a form of default. (Ex. 3.) Holding that any sale of Bolin-owned jewelry is a default would be unreasonable because it would deny Ulanoff the ability to operate her store. Ogden's purpose in making the loan was to help, not stymie, Bolin's retail business, and the meaning of what constitutes a default should be interpreted consistently with the parties' intent of assisting Bolin. *See Aruba Hotel Enters. N.V. v. Belfonti*, 611 F. Supp. 2d 203, 209 (D. Conn. 2009) ("'A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction.'" (quoting *Lawson v. Whitey's Frame Shop*, 697 A.2d 1137, 1141 (Conn. 1997))). The Trustee argues that rendering any encumbrance or any civil judgment a default would be similarly unreasonable and should not establish Bolin's default of Ogden's loan.

The Uniform Commercial Code does not define the word default but, instead, leaves the meaning for the parties to decide in the terms of their security agreement. *Cofield v. Randolph County Comm'n*, 90 F.3d 468, 471 (11th Cir. 1996) (citing 4 James J. White & Robert S. Summers, Uniform Commercial Code § 34-2 (4th ed. 1995) ("White & Summers")); *Mfrs. Hanover Leasing Corp. v. Ace Drilling Co.*, 726 F. Supp. 966, 968 (S.D.N.Y. 1989). The security agreement's definition of default therefore governs this case. The Trustee is correct that the definition inscribed in a security agreement should not apply if that definition is

unconscionable, was not made in good faith, or is otherwise unreasonable. *See* Conn. Gen. Stat.

§ 42-1-302(b) ("The obligations of good faith, diligence, reasonableness and care prescribed by

this title may not be disclaimed by agreement."); 4 White & Summers, § 34-2 ("Apart from the

modest limitations imposed by the unconscionability doctrine and the requirement of good faith,

default is whatever the security agreement says it is." (quotation omitted)). But Bolin and

Ogden's mutual definition of default as an encumbrance, such as a pawn lien on, or civil

judgment against, the store's inventory is neither unconscionable nor unreasonable, and does not

exhibit bad faith.

A definition of default that restricts Bolin's sale of jewelry in its normal course of

business would be unreasonable and not permitted under the UCC because both parties

anticipated that Bolin would use Ogden's loan for retail purposes. Even so, that does not compel

the further conclusion that encumbrances and civil judgments are also unreasonable definitions

of default. Unlike the case of defining default as the sale of jewelry, pawning items and being

subject to civil judgments are not a reasonably expected part of a jewelry store's business.

Ogden did not lend the store $270,000 with the anticipation that Ulanoff and Citrin would pawn

jewelry in order to keep the business operating. Indeed, it seems quite reasonable for a lender to

protect her loan by defining default in terms of actions against the debtor that threaten the

collateral securing the loan or signal the debtor's imminent insolvency and inability to repay its

debt. Defining default as encumbrance of the collateral or as civil judgments against the debtor

therefore does not run afoul of the UCC.

Next, the Trustee argues that Ogden cannot claim that the security agreement allowed her

to enter Bolin's premises when she did not know of or remember the security agreement's

existence, much less its terms concerning her remedies for default. Nothing in the security agreement, however, requires the party repossessing collateral to know her rights in the event of a default before engaging in self-help. Nor has the Trustee identified any Connecticut law holding that a party must be aware of her legal rights under a security agreement in order to repossess collateral securing her loan. Indeed, both the security agreement and section 42a-9-609 are silent with respect to the secured party's knowledge or state of mind at the time of repossession. The key, rather, is whether the debtor defaulted. Here, a default did occur: Bolin had encumbered its inventory by pawning its jewels and had been the subject of several civil judgments filed by vendors and other parties. Once Bolin defaulted, Ogden's security agreement permitted her to exercise her rights of repossession.

The final argument the Trustee submits is that Ogden breached the peace when she exercised her self-help rights. That is, even if Bolin did default on the security agreement and Ogden was entitled to take possession of inventory in order to protect her loan, Ogden is nonetheless liable because she resorted to self-help in an unlawful manner. The Trustee, however, has not met his burden to prove that Ogden breached the peace when she repossessed Bolin's property.

"Breach of the peace" is undefined in the UCC, so the courts have developed a definition on a case-by-case basis. Conn. Gen. Stat. § 42a-9-609, comment 3. Examples of breach of the peace include when a creditor repossesses property by using force or threat of force, *Rogers v. Allis-Chalmers Credit Corp.*, 679 F.2d 138, 141 (8th Cir. 1982); when a debtor physically protests the repossession while it occurs, *Clark v. Auto Recovery Bureau of Conn.*, 889 F. Supp. 543, 546-47 (D. Conn. 1994); or when a police officer's presence is necessary to safely effectuate

the taking of collateral, *In re MacLeod*, 118 B.R. 1, 3 (Bankr. N.H.) (1990). There is no breach of the peace when the debtor voluntarily grants the creditor permission to enter the debtor's premises or to take possession of the collateral. *Rogers*, 679 F.2d at 141; *Rainwater v. Rx Med. Servs. Corp.*, No. CV-95-5596, 1995 WL 097888, at *6 (E.D. Cal. 1995).

The plaintiff claims that a breach of the peace occurred because Ogden created a chaotic scene when she entered the store the week of July 30, 2004 to prepare to and eventually take the store's inventory. The evidence of the chaos is questionable, however. Joel Liffman testified that when he came to the store, there was only one other person present besides him, Ogden, and Howey. Although the store was in a disheveled state – pieces of jewelry were out of their cases or safes, and were placed somewhat haphazardly on the store's counter tops – there was no evidence that anything unruly was taking place. No police officer was present or called while Liffman was in the store.

The plaintiff supports its chaotic-scene theory with testimony that at least one police officer was present at the store on July 30 to maintain order. Although the evidence is uncontradicted that a police officer was in the store at some point on July 30, the Trustee never established why that officer was present. The mere presence of a police officer while a repossession is taking place is not sufficient to establish a breach of the peace; rather, breach of the peace occurs when a police officer is present in order to assert his or her authority and compel a debtor to give a secured party possession of collateral. *In re MacLeod*, 118 B.R. at 2-3 (citing cases finding breach of the peace when police officers are present in order "to override the debtor's right to object"); *cf. United States v. Coleman*, 628 F.2d 961, 964 & n.1 (6th Cir. 1980) (distinguishing "mere acquiescence by the police 'to stand by in case of trouble'" from cases

where unlawful repossession occurred when the police "affirmatively participat[ed]" in the taking of collateral from a debtor). There was no evidence that the officer was present to override a Bolin agent's attempt to keep the store's property from leaving the premises. Rather, it appears that the police officer was present in order to facilitate the Greenwich Police Department's own investigation of the store's unlawful activity and to ensure that vendors could search through Bolin's jewelry in an orderly fashion and immediately report lost items – neither of which would establish a breach of the peace. The Trustee did not provide enough evidence about the police officer's reason for appearing in the store to meet his burden that a breach of the peace took place.

Finally, there was no breach of the peace because Bolin, through the actions of its employee and agent Shannon Howey, allowed Ogden to enter the store. The evidence is uncontradicted that Howey was Bolin's manager during the week of July 30, 2004, and had the power to admit and deny entry to the store. Although Howey did not have power to consent to giving the store's jewelry to Ogden or anyone else, the fact that she authorized Ogden's admission to the store is a significant fact militating against the Trustee's claim that Ogden breached the peace. *See Rainwater*, 1995 WL 907888, at \*6 (rejecting argument that "consent to repossession of the collateral taken was required" in order to find no breach of peace because only consent to enter the debtor's property was necessary).[16] And although Howey had resigned

---

[16] *Ford Motor Credit Co. v. Byrd*, 351 So. 2d 557 (Ala. 1977), which the Trustee cites, is not to the contrary. In *Ford*, a car dealership fraudulently invited a debtor to drive to its store in order to discuss the debtor's delinquent payments; during the ensuing discussion at the dealership, the dealer surreptitiously repossessed the debtor's car. The Alabama Supreme Court held that it was a breach of the peace for the creditor to have obtained possession "through trick, without knowledge upon the part of the debtor." *Id.* at 559. The Trustee claims that Ogden used the same kind of trickery in gaining possession of Bolin's inventory. The analogy does not hold,

her position on the morning of July 30, neither she nor any other Bolin agent attempted to stop Ogden from taking possession of the store-owned jewels. Ogden's admission to the store, coupled with the absence of any violence, force, or struggle in taking Bolin's inventory, leads me to conclude that Ogden did not breach the peace when she took possession of the collateral. *See id.* (holding that there was no breach of the peace when debtor's agent consented to secured party's entrance and no force was necessary in repossessing the collateral); *Girard v. Anderson*, 257 N.W. 400, 402-03 (Iowa 1934) (holding, in common law case predating the UCC, that breach of the peace occurred when creditor entered home without debtor's consent and force was necessary to gain possession).

In sum, Ogden successfully defends against all of the Bankruptcy Trustee's claims against Bolin for her unlawful taking of Bolin property by showing that Bolin was in default under the terms of her security agreement, and that her repossession of collateral was permitted by the security agreement and consistent with Connecticut law. The plaintiff, therefore, has failed to meet its burden in proving that Ogden was liable for trespass, conversion, wrongful repossession, or statutory theft.

3.     *Ogden's return of jewelry to vendors*

The Trustee next claims that Ogden is liable for tortiously interfering with Bolin's business relationships with vendors and certain customers. The theory of this cause of action is that Ogden interfered with Bolin's business relationships when she and Howey returned items in Bolin's possession to vendors and customers during the week of July 30, 2004, and that, had

---

however, for one simple reason: Ogden did not trick anyone. Bolin, acting through its employee and agent Shannon Howey, permitted her to enter the store knowing that Ogden intended to take possession of jewelry. Ogden's intent was obvious; there was no subterfuge involved.

Ogden not returned jewels to vendors and customers, Bolin could have continued its business upon Ulanoff's return and avoided its hasty bankruptcy. To meet his burden in proving that Ogden is liable for tortiously interfering with Bolin's business expectancies with vendors, the Trustee must satisfy three elements. The Trusteee must prove that (1) there were business relationships between Bolin and its vendors and customers; (2) Ogden intentionally interfered with those business relationships while knowing of them; and (3) because of the interference, Bolin suffered an actual loss. *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 761 A.2d 1268, 1273 (Conn. 2000). Once the plaintiff has proved those elements, he is entitled to damages, which include the profits that the plaintiff lost because of the defendant's tortious conduct, as well as consequential damages. *Id.*; *Am. Diamond Exch., Inc. v. Alpert*, 920 A.2d 357, 370 & n.12 (Conn. App. Ct. 2007) (citing Restatement (Second) of Torts § 774A(1)).

On the facts that the Trustee established at trial, the Trustee succeeded in satisfying all of the elements of his tortious interference claim. First, the Trustee provided affirmative evidence that Bolin held consignment relationships with vendors, such as Emsaru, Piranesi, and Carol Goldstein, and consignment and other business relationships with customers, such as Joel Liffman. *Cf. Cent. Sports, Inc. v. Yamaha Motor Corp., U.S.A.*, 477 F. Supp. 2d 503, 513 (D. Conn. 2007) (holding that plaintiff's tortious interference claim failed because plaintiff did not present "affirmative evidence supporting the existence of a prospective business relationship" to satisfy tort's first element). Evidence of those business relationships is contained in Bolin's inventory records, and is confirmed by the fact that vendors and customers contacted the Greenwich Police Department and came to Bolin to retrieve their jewels on or before July 30, 2004. The plaintiff has fully demonstrated the existence of those business relationships and that

Bolin expected those relationships to continue into the near future, i.e., until the store was able to sell the consigned jewelry or returned the unsold items. Indeed, Ogden does not contest that Bolin had present and ongoing consignment or other business relationships with vendors and customers.

At trial, Ogden challenged the sufficiency of the Trustee's evidence with respect to the store's business relationships with consumers, arguing that the plaintiff never established that Bolin expected, to a degree of reasonable certainty, that retail customers would buy the consigned jewels that Ogden returned to the vendors and customers. Ogden, however, mistakes the nature of the Trustee's tortious interference claim. The Trustee is alleging that Ogden interfered with the supply side of Bolin's operations – specifically, with the relationships between the store and the vendors and customers who furnished pieces of jewelry to Bolin for consignment, and between the store and particular customers, such as Joel Liffman, who paid Bolin to acquire jewelry on their behalf. The Trustee is not basing his tortious interference cause of action on the loss of consumer demand and prospective relationships with retail buyers. Ogden's point – that there is too much uncertainty about how much jewelry Bolin could be expected to sell in the future – is more properly understood as a challenge to the plaintiff's proof with respect to the tort's third element, whether the Trustee sufficiently demonstrated that Bolin suffered an actual loss because of Ogden's action. I turn to that issue shortly. With respect to the first element of tortious interference, however, the plaintiff met his burden by proving by a preponderance of the evidence that Bolin held specific supply-side relationships with customers and vendors – namely, relationships whereby Bolin sold their consigned items or purchased items on their behalf – that were expected to continue after July 30, 2004.

Next, the Trustee proved that Ogden knew of Bolin's relationships with its jewelry suppliers and maliciously, or intentionally, interfered with them. *See Am. Diamond*, 920 A.2d at 363 ("In the context of a tortious interference claim, the term malice is meant not in the sense of ill will, but intentional interference without justification." (internal quotation omitted)). The Trustee presented evidence that Ogden and Howey contacted vendors and customers on or before July 30, 2004 to inform them of Bolin's poor financial shape and to arrange the return of jewelry from Bolin to them. Phone records from Bolin's phone line and from Ogden's cell phone show that more than half a dozen vendors were contacted by her and Howey. The evidence is clear that Ogden knew or learned of Bolin's consignment agreements with its vendors and customers – in some cases, Ogden got in contact with vendor representatives, such as John Shaban, whom Andrea Ulanoff had not even met yet – and acted deliberately to return jewelry to them.

In addition, Ogden has not shown any justification for her conduct. Although Ogden was within her personal right to repossess Bolin's jewelry as collateral for her secured loan, her security agreement did not entitle her to return any consigned items to third-party owners. Ogden also argues that no harm was committed because the vendors, as consignors, were entitled to recover possession of their items. The fact that vendors and customers were contractually permitted to recover their consigned property does not provide a defense to the claim of tortious interference, however; the fact that Ogden's conduct did not lead any vendor or customer to breach a contract does not prove that she did not interfere tortiously with Bolin's business relationships. *Cf. Am. Diamond*, 920 A.2d at 366 (holding that knowing diversion of customers away from business was sufficient to establish tortious interference, even though no contractual breach occurred). All that matters in this claim is that Bolin lost the opportunity to sell jewelry in

-43-

its possession according to the terms of existing consignment and other commercial agreements.

There was also no exigency warranting Ogden's actions. Ogden and Howey contacted vendors and facilitated the repossession of Bolin's inventory that was still being held safely in the store and had not been lent out or used as collateral. Even assuming, for the sake of argument, that Ogden would have been justified in returning items potentially at risk of being pawned, there was no risk that Bolin would have used jewelry as collateral during the week of July 30, 2004. During that time period, Ulanoff and Citrin – the only two people who pawned Bolin's inventory – were out of the country. Finally, I find that Ogden was not acting according to the direction of law enforcement. At most, Munrow asked Ogden to notify vendors whose items had been hocked and requested that those vendors contact the Greenwich Police Department; no one instructed her to seek out vendors for the purpose of returning their jewelry that was secure on Bolin's premises. Ogden therefore cannot claim she was following the orders of law enforcement. The Trustee has proven by a preponderance of the evidence that Ogden maliciously interfered with Bolin's business relationships with third-party owners of jewelry in the store's possession, and lacks any defense or justification for her conduct. Thus, the second element of tortious interference is proven.

Finally, the Trustee demonstrated that the store suffered an actual loss because of Ogden and Howey's actions. In order to meet its burden of proving that Bolin suffered an actual loss, the Trustee must demonstrate that, had Ogden not acted tortiously, there was a "reasonable probability" that Bolin would have made a profit or would not have suffered the same set of consequential damages. *Am. Diamond*, 920 A.2d at 367 (quoting *Goldman v. Feinberg*, 37 A.2d 355, 356 (Conn. 1944)). The Trustee must marshal enough evidence to establish "some

certainty" that Ogden caused the harm to Bolin; actual loss must be more than "surmise or speculation." *Goldman*, 37 A.2d at 356.

The Trustee's theory of actual loss in this case is better characterized as a set of consequential damages than lost profits. The Trustee alleges that Ogden's tortious interference caused Bolin's untimely closing and bankruptcy. At trial, the Trustee did not aim to prove the value of what Bolin expected to earn had it been able to sell the consigned items that Ogden returned to vendors and customers. Rather, he sought to prove Bolin's value as an existing company – specifically, what Bolin would have earned had it been able to sell its entire business in an orderly liquidation and not in a state of distress. The Trustee claimed that Bolin dissolved and had to sell its inventory in a fire sale as a consequence of Ogden's tortious interference with the store's business relationships. By going beyond her rights under the security agreement and returning all of the store's consigned jewelry to vendors and customers – and, in the process, spreading word of Bolin's poor financial shape and questionable business practices – Ogden deprived Bolin of the opportunity to continue its retail business once Ulanoff and Citrin returned from their vacation. For, after Ogden and Howey had returned the consigned inventory and Ogden had rightfully repossessed the remaining store-owned inventory, there was little left for Bolin to sell as a retailer. Moreover, the store's reputation was ruined and Bolin would have been unable to enter new consignment agreements.

Bolin was forced to close permanently, declare bankruptcy, and, after regaining possession of the inventory Ogden took as collateral, sell its assets at fire-sale prices. Because the Trustee's theory focuses on the ultimate consequence of Ogden's action – i.e., Bolin's hasty bankruptcy – and not on the particular profits that the Trustee stood to earn from the returned

consigned jewelry, the actual losses caused by Ogden's tortious interference were consequential damages and not lost profits. The Trustee has succeeded in establishing a reasonable probability that, but for Ogden's tortious conduct, Bolin would not have dissolved immediately and could have liquidated its assets in an orderly fashion and avoided accepting fire sale prices. It is undeniable that the store was in dire financial straits before the week of July 30, 2004; both sides' valuation experts concluded that the store's liabilities exceeded its assets before Ogden and Howey effectively shut the store for good. But Bolin was not in a position of imminent collapse at that point. On the contrary, Bolin was capable of operating just as it had been when Ulanoff left for Italy, selling jewelry that the store owned and held on consignment; indeed, the evidence shows that had Ogden only taken store-owned jewelry, approximately two-thirds of the store's inventory would have been available for retail. Bolin was stable enough for Ulanoff, upon returning from abroad, to have performed an orderly liquidation of the store's assets. But that opportunity was squelched when Ogden, in concert with Howey, purged the majority of the store's inventory by returning consigned items to vendors and customers.

The Trustee has proven that Ogden's tortious interference with Bolin's business relationships contributed to the store's final closing, and that there was a reasonable probability that, had Ogden not acted tortiously, Bolin would not have suddenly gone out of business and would have been able to liquidate its assets in a calm, orderly fashion. This satisfies the actual loss requirement of the Trustee's tortious interference cause of action, the final element to be proved. The Trustee has therefore met his burden to prove that Ogden is liable for tortiously interfering with Bolin's business relationships.

4.      *Equitable Subordination*

Before turning to the issue of damages, I briefly address the Trustee's final claim for equitable subordination.  Pursuant to 11 U.S.C. § 510(c)(1), a court sitting in bankruptcy can exercise powers in equity and subordinate a claim or interest relative to others for the purposes of distribution.  When deciding whether equitable subordination is appropriate in a case, courts require the party moving for equitable subordination to demonstrate the following three elements: (1) the creditor in question engaged in some inequitable conduct; (2) the misconduct resulted in injury to other creditors or unfairly advantaged the claimant; and (3) equitable subordination of the creditor's claim must not be inconsistent with other provisions of the Bankruptcy Code.  *Benjamin v. Diamond* (*In re Mobile Steel Co.*), 563 F.2d 692, 699-700 (5th Cir. 1977); *In re Mr. R's Prepared Foods, Inc.*, 251 B.R. 24, 28-29 (Bankr. D. Conn. 2000).  Equitable subordination is an "unusual remedy" to be used in "limited circumstances."  *Fabricators, Inc. v. Technical Fabricators Inc.* (*In re Fabricators, Inc.*), 926 F.2d 1458, 1464 (5th Cir. 1991).  Whether to impose equitable subordination as a remedy in a given case is within a district court's discretion.  *E.g.*, *Henry v. Lehman Commercial Paper, Inc.* (*In re First Alliance Mortgage Co.*), 471 F.3d 977, 1006 (9th Cir. 2006); *S.E.C. v. Great White Marine & Recreation, Inc.*, 428 F.3d 553, 556 (5th Cir. 2005); *In re Envirodyne Indus., Inc.*, 79 F.3d 579, 583 (7th Cir. 1996).

The Trustee has failed to sustain his burden of proof on the equitable subordination claim.  In particular, the Trustee never demonstrated that Ogden's conduct was inequitable.  The Trustee, as explained above, certainly succeeded in showing that Ogden acted tortiously.  But the Trustee has not shown that her conduct, although wrongful, advantaged her relative to Bolin's other

creditors, thus warranting the subordination of her claim. *See Comstock v. Group of Inst. Investors*, 335 U.S. 211, 229 (1948) (holding, in bankruptcy of a subsidiary debtor, that subordination of the controlling corporation's claims was appropriate when the corporation used its position "to advantage itself at the injury of the subsidiary"); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990) (stating, in breach of contract claim, that "'[i]nequitable conduct' in commercial life means breach plus some advantage taking"). And with respect to the second element, bankruptcy courts in this Circuit have held that equitable subordination requires a conjunctive showing that the creditor unfairly advantaged herself and that she harmed the debtor or other creditors. *In re Mr. R's*, 251 B.R. at 29; *Midlantic Nat'l Bank N., N.A. v. Borg-Warner Acceptance Corp.* (*In re Mayo*), 112 B.R. 607, 651 (Bankr. D. Vt. 1990) (citing *Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 610-11 (2d Cir. 1983)); *but see 80 Nassau Assocs. v. Crossland Fed. Savings Bank* (*In re 80 Nassau Assocs.*), 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994) (quoting *Mobile Steel* test for second element of equitable subordination and implying that the test is disjunctive). Bolin's closing harmed Ogden just as much as creditors. Ogden returned to the Bankruptcy Trustee all of the inventory that she claimed as collateral, and she has yet to be repaid for her loan. Equitable subordination would therefore be inappropriate in this case because Ogden has not unjustly enriched or otherwise inequitably advantaged herself relative to other creditors. Rather, she now stands as disadvantaged as any other creditor. The Trustee has failed to prove the first and second elements required for equitable subordination.

Furthermore, in a case where equitable subordination is to be applied against a "non-insider" or non-fiduciary party, equitable subordination is reserved for "egregious conduct," such

as fraud, spoliation, or overreaching. *Schubert v. Lucent Techs.* (*In re Winstar Commc'ns, Inc.*), 554 F.3d 382, 412 (3d Cir. 2009); *Estes v. N&D Props.* (*In re N&D Props.*), 799 F.2d 726, 731 (11th Cir. 1986); *In re 80 Nassau Assocs.*, 169 B.R. at 838-39 (Bankr. S.D.N.Y. 1994). Courts have rarely, if ever, found conduct by a non-insider to rise to this "egregious" level. *See In re 80 Nassau Assocs.*, 169 B.R. at 839 ("The cases that enunciate the 'gross and egregious' or similar standard uniformly fail to find conduct that meets the standard, and deny equitable subordination."). And those courts that have equitably subordinated a non-insider or non-fiduciary's claim have found that the claimant "committed some breach of an existing, legally recognized duty arising under contract, tort or some other area of law." *Id.* at 40. Equitable subordination based on a claimant's tortious conduct has been limited to "fraud, misrepresentation, estoppel or similar conduct that justifies the intervention of equity." *Id.*

As explained previously, Ogden was not a member or manager of Bolin but was merely a lender to the store. She was not a Bolin "insider" or fiduciary. As a result, equitable subordination would be appropriate only if her conduct was egregious, on par with fraud or spoliation. The Trustee has succeeded in proving that Ogden acted intentionally when she and Howey returned consigned jewelry to vendors and customers. But the plaintiff has not proved that Ogden returned the items with the intent to harm Bolin or otherwise act to the store's detriment. On the contrary, the evidence at trial shows that Ogden and Howey returned the consigned jewelry in part to protect Bolin's interests; Ogden was partly motivated to prevent Ulanoff from fraudulently and illegally hocking more jewelry that Bolin did not own. Returning consigned items arguably would deny Ulanoff the opportunity to put the store's and creditors' interests in even more jeopardy. Ogden's conduct, therefore, does not rise to the level of fraud,

spoliation, misrepresentation, or any other tort that would warrant an equitable remedy.

Because Ogden, a creditor to Bolin, did not advantage herself relative to other creditors and did not commit an egregious act on par with fraud or spoliation, equitable subordination is not an appropriate remedy in this case. I now turn to the damages to which the Trustee is entitled on the tortious interference cause of action.

## II.    Damages

The Trustee succeeded on his tortious interference claim and proved that Ogden is liable for damages she caused by returning inventory to vendors and customers during the week of July 30, 2004. Ogden, however, argues that the Trustee did not meet his burden of proof with respect to damages because the evidence shows that Bolin was already insolvent by July 30, 2004 and the store would have closed even without Ogden's actions. Contrary to the defendant's characterization, however, the Trustee did not set out to prove that Ogden harmed Bolin by singlehandedly causing the store to dissolve. Instead, the Trustee argues that Ogden was responsible for the particular manner of closing that Bolin experienced. Ogden was responsible for the fact that Bolin had to sell its assets in a fire sale and lost revenue that it would have commanded had it wound down in an orderly fashion. The Trustee has proven that Ogden was the proximate cause of the rushed sale; it was because of her return of consigned jewelry that the store had to file for sudden bankruptcy and sell its assets at distressed prices.

Ogden, therefore, is liable for the additional amount that Ulanoff would have obtained had she sold the business or been able to orderly liquidate Bolin's assets. Those damages are equal to the value of Bolin in July 2004, just before Ogden and Howey took actions that led to the store's permanent closing, less any amount that the Trustee has already made and is likely to

make from the sale of Bolin's inventory in its current bankruptcy. At trial, the Trustee testified that this latter value was approximately $140,000.

The Trustee's problem in this case, as the defendant has argued, is proving the amount Bolin was worth before July 30, 2004. Proof of damages in a tortious interference claim does not have to be precise; the plaintiff must only establish the loss it sustained to a "reasonable certainty." *Beverly Hills Concepts, Inc. v. Schatz and Schatz, Ribicoff and Kotkin*, 717 A.2d 724, 734 (Conn. 1998). Although evidence of Bolin's accounts may be the most preferable way to tally the extent of harm that Ogden caused, other less quantitative sources, such as testimony by Ulanoff and the opinions of both sides' experts, may be considered as well. *See Conrad v. Erickson*, 675 A.2d 906, 908 (Conn. App. Ct. 1996) (holding that trial court did not abuse discretion when considering plaintiff's affidavit estimating lost profits on basis of professional "experience and knowledge"). Damages, therefore, need not be mathematical or confined to the contents of Bolin's ledgers. But evidence supporting a damages determination, such as an expert's opinion regarding Bolin's value at the time of its closing, must be reasonable. *Beverly Hills Concepts*, 717 A.2d at 736.

Kenneth Pia, the Trustee's expert, and John Kramer, Ogden's expert, proposed two premises of value for Bolin: the value of the store's income and the value of its assets. The income premise of value measures the value of Bolin as a going concern. That is the present value of the store as an extant business, and incorporates a discounted value of the future income that the store can be expected to earn, based on the store's projected growth and the risk that the business will become insolvent or close. Alternatively, Bolin's value can be measured by its net assets, which examines what the business would command in the hypothetical event that it

liquidated all of its assets in an immediate, orderly fashion. That valuation does not consider the future viability of the company but only examines the company's current assets relative to its current liabilities. Although an asset valuation relies on fewer assumptions than a going concern valuation, it is not the preferred method for assessing the business's value; both experts initially intended to rely on Bolin's asset value only as a check or comparison against the income values they derived.

Pia and Kramer both agreed that, at the end of July 2004, Bolin was insolvent and the store's net equity was zero. (Ex. 1024.) In other words, it is unrealistic to assume that any buyer would have bought Ulanoff's stake in the company because Bolin's total assets were smaller than its liabilities. The store's value was in its inventory, which it could unload in an orderly liquidation, and not in its continued existence as a retailing business. The net asset approach, therefore, is the appropriate way to evaluate the company's worth, especially when one considers that the plaintiff's theory of damages is to determine the amount of money Bolin could have reasonably been expected to earn had it been able to sell its assets in an orderly process.

The experts for the Trustee and Ogden relied on Bolin's internal financial records to determine the ongoing-concern and asset values for the company. Pia and Kramer valued Bolin's total assets as of July 22, 2004 at slightly more than $1.5 million; their two total asset values differ by approximately $20,000, a relatively immaterial amount. (Ex. 1024.) Based on Bolin's electronic inventory system, both experts also agreed that Bolin's owned jewelry on July 22, 2004 was worth, at cost, between $1.2 and $1.3 million, and that the current asset value – which reflects the sum of the store's inventory, accounts receivable, and undeposited funds – was around $1.4 million. (*Id.*) Pia and Kramer recognized that if the internal records were

-52-

inaccurate, then their assessments of the company's worth would be inaccurate, too. Pia believed the records to be sufficiently accurate to rely upon; Kramer, however, doubted their soundness and opined that they were likely overstated.

Pia concluded that the market value of invested capital for Bolin's assets – in other words, the fair market value of its total assets less its current liabilities – was $928,498. That was based on current assets totaling $1,576,150 and current liabilities totaling $647,652. (Ex. 528 at 7-8.) Kramer, however, did not provide a net asset value. In his view, performing an orderly liquidation valuation would have been pointless because the store's liabilities were clearly in excess of what Bolin could have received in exchange for its assets. Based on the totals in his expert report, however, in which he estimated that Bolin had $1,556,529 in total assets and $894,374 in current liabilities (ex. 541 at 18-19), Kramer would have produced a net asset value of $662,155 for the store. The difference between Pia's and Kramer's valuations stems principally from the difference in their calculations of Bolin's current liabilities. Kramer estimated that Bolin owed approximately $312,000 in pawn debts, while Pia thought the debt was about $189,000. (*Compare* Ex. 528 at 8, *with* Ex. 541 at 19.) In addition, Kramer added accrued interest from Bolin's long-term debt to Bolin's current liabilities, which he valued at approximately $139,000. (Ex. 541 at 19.)

The experts thus disagree with each other in several important ways. First, they disagree whether to incorporate Bolin's total liabilities – in particular, whether to include Bolin's long-term, interest-bearing debt, especially the secured debt that Bolin owed to Sylvia Ulanoff, Sally Ogden, and the various pawnbrokers. Pia, the Trustee's expert, opined that only current liabilities, such as moneys owed in accounts receivable, should be included in the calculations;

but Kramer, Ogden's expert, asserted that all of Bolin's secured debt, such as the loans from Ulanoff, Ogden, and the pawnbrokers, should be included as well. Put differently, Pia believed that long-term, interest-bearing debt did not affect the value of Bolin's net asset value, while Kramer believed that those liabilities were important because they affected the store's equity. That is, in Kramer's view a potential buyer of Bolin could not obtain the assets of the store without also assuming Bolin's debt obligations, so they had to be included in a calculation of the store's total worth.

Kramer's analysis is inapposite to the Trustee's theory of damages, however. The Trustee is claiming that Ogden's tortious interference caused Bolin's immediate bankruptcy and deprived the company of the opportunity to wind down and sell its assets in an orderly fashion. That is captured in Bolin's net asset value. The Trustee is not arguing that Ogden deprived Ulanoff of the opportunity to bundle Bolin's assets and liabilities together and sell her equity in the store. But, by insisting that all of Bolin's debts be included, that is what Kramer measured. Because Kramer's valuation approach is not consistent with the Trustee's theory of damages, I do not find his damages determination persuasive. Instead, I find that the Trustee's proposed net asset value – essentially, the difference between Bolin's total assets and its current liabilities – is the appropriate way to value Bolin and determine the damages Ogden owes the plaintiff.

The second point of contention concerns the underlying numbers used to compute Bolin's income and asset values. Primarily, the problem is valuing Bolin's store-owned jewelry. Kramer was very skeptical of Bolin's figures and believed that records of the store's inventory were overstated. Pia, however, was more sanguine about the reliability of the store's records and his conclusions concerning Bolin's inventory value. Undoubtedly, there are significant problems in

Bolin's records. As described above, there are discrepancies between the value reported in the store's electronic inventory system and the value reported in the store's physical inventory totals. The evidence submitted at trial showed Bolin's records were likely incorrect and I agree with Kramer that the inventory values were likely overstated. Therefore, I do not accept Bolin's records for the store's owned jewelry, which was between $1.2 and $1.3 million.

The most persuasive piece of evidence concerning the value of Bolin's owned jewelry were Santiago's and Dubiago's analysis of the store's sale records. For 2003, Dubiago concluded from Santiago's bookkeeping that the store had $721,236.98 in Bolin-owned inventory, even though the store's electronic inventory system reported more than $1.3 million in owned jewelry. That figure can reasonably be assumed to be higher by mid-2004 on the basis of testimony that Bolin's inventory grew every year. How much higher that total should be is unclear because the evidence presented at trial about the store's growth rate is sketchy. The piece of evidence that is most compelling is Pia's report, which states that Bolin reported $1.8 million in sales in 2003 and was projected to have sales of approximately $2 million in 2004. (Ex. 528 at 6.) Assuming that the growth rate for the store's inventory was parallel, and Bolin was expected to increase its owned inventory by 10 percent, then Bolin owned approximately $800,000 in jewelry at the time of its closing. The gap between this approximate value of store-owned jewelry and the amount listed in Bolin's electronic inventory system is consistent with the gap that Dubiago observed in 2003 between the store's accounting records and its electronic inventory system. I therefore find that Bolin held approximately $800,000 in owned jewelry at the time of its closing on July 30, 2004, a difference of $439,386 from Pia's figures. (*See* Ex. 528 at 7 (estimating inventory to be worth $1,239,386).) Substituting $800,000 for the store's

inventory value produces a total asset value of $1,136,754, based on Pia's tabulation. (*See id.* (estimating total assets of $1,576,150).)

The parties are in disagreement about the value of the store's current liabilities, too, because they have submitted different values for the short-term loans Bolin owed to pawnbrokers. I find the number submitted by Ogden better documented and more persuasive, and conclude that the total amount Bolin owed for the items it pawned was $311,861. On the other hand, contrary to Kramer, I do not include the interest owed on Bolin's long-term debt in calculating Bolin's current liability value; that interest should be included as a long-term liability not subtracted in the net asset value determination. Substituting Kramer's calculation for Bolin's short-term pawn liabilities and taking Pia's other current liability values (see Ex. 528 at 8), I find that Bolin's total current liabilities as of July 30, 2004 were $770,470.

With total assets of $1,136,754 and current liabilities of $770,470, Bolin had a net asset value of approximately $366,000 at the time of its closing. The final damages amount is equal to the net asset value less that amount that the Trustee has already raised and can expect to raise by liquidating Bolin's assets. According to Michael Daly's testimony, that latter value was approximately $140,000. The final damages amount that Ogden owes to the plaintiff, therefore, is $226,000.

I conclude that $226,000 is the reasonable amount that Bolin could have expected to earn from an orderly liquidation of its assets. That amount takes into account the total assets in Bolin's possession as of July 2004, and adjusts for the overstatement of the store-owned jewelry reported in Bolin's electronic inventory system. It also takes into account the store's current liabilities, including the value of its pawn debt, pawn interest, and fees.

**III.    Conclusion**

For the reasons stated above, I find Sally Ogden liable for tortiously interfering with the business relations of Bolin & Company, LLC.  Her deliberate actions to return consigned jewelry to third parties caused the collapse of Bolin and deprived its owner of the opportunity to wind down its business and perform an orderly liquidation.  This resulted in damages to the store in the form of lost revenues from an orderly liquidation of its assets totaling $226,000.

Sally Ogden, therefore, must pay $226,000 in damages to Ronald Chorches, Trustee of the Estate of Bolin & Company, LLC.  The clerk shall enter judgment and close the file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 22nd day of September 2010.

/s/ Stefan R. Underhill
        Stefan R. Underhill
        United States District Judge